UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KIMADA DIXSON,

                          Petitioner,

              -v.-

JAMIE LAMANNA,

                          Respondent.

18 Civ. 8285 (KPF) (SN)

**OPINION AND ORDER
ADOPTING REPORT AND
RECOMMENDATION**

KATHERINE POLK FAILLA, District Judge:

        Pending before the Court is the August 31, 2021 Report and

Recommendation issued by United States Magistrate Judge Sarah Netburn (the

"Report" (Dkt. #25), copy attached), addressing Petitioner Kimada Dixson's

petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254.  Judge

Netburn recommends that Dixson's habeas petition (the "Petition") be

dismissed in its entirety.

        The Court has examined the Report and notes that no party has objected

within the fourteen-day period from its service, as provided by 28 U.S.C.

§ 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  Nor has any

party objected within the extended period of time the Court provided following

Petitioner's letter of October 21, 2021, requesting copies of certain documents

related to his Petition.  (Dkt. #26, 27).  For the reasons set forth below, the

Court finds no error in the Report and adopts it in its entirety.

## BACKGROUND

        The relevant facts underlying this action are set forth in the Report, and

the Court assumes familiarity with them.  A brief overview is set forth herein,

drawing from the recitation of the facts in the Report (*see* Report 1-16), as well as from entries in the public docket.

On October 28, 2011, Dixson was arrested in connection with the August 1, 2011 robbery of Freddy Chavez at the Hunts Point Fish Market. (Report 1, 4). Prior to Dixson's arrest, Chavez had twice identified Dixson as the person who robbed him, first in a police-arranged photo array on August 11, 2011, and again in a lineup on October 28, 2011. (*Id.* at 4). Following Dixson's arrest, on November 15, 2011, Dixson was indicted by a Bronx County grand jury on several charges related to the robbery. (*Id.*).

Before trial, Dixson moved through counsel to exclude Chavez's identifications from the photo array and lineup on the basis that they were unduly suggestive and tainted by the fact that three days after the robbery, the fish market's security director, Victor Seguinot, had shown Chavez two photos of the suspected robber. (Report 3-5). Supreme Court Justice James M. Kindler conducted a multi-day hearing pursuant to *United States* v. *Wade*, 388 U.S. 218 (1967); *Dunaway* v. *New York*, 442 U.S. 200 (1979); and *Payton* v. *New York*, 445 U.S. 573 (1980), to determine whether the contested identification evidence should be excluded and whether Dixson's warrantless arrest at the men's shelter where he was residing was unconstitutional. (*Id.* at 4-5). The hearing, which concluded on April 24, 2013, included testimony from Dixson, Chavez, and Detective Margo Green, the officer who investigated the robbery. (*Id.* at 5-9). Justice Kindler denied the suppression motion from the bench and explained in a subsequent written opinion, dated May 9, 2013,

that: (i) neither the photo array nor the lineup was unduly suggestive; (ii) Dixson's arrest was supported by probable cause following the photo and lineup identifications; and (iii) suppression of the lineup was not appropriate. (*Id.* at 8-9; Dkt. #13-3 at 5-10).

On May 10, 2013, following a four-day trial in Bronx County Supreme Court, the jury returned a verdict finding Dixson guilty of first-degree robbery. (Report 14).[1]  On May 28, 2013, after the verdict, but before sentencing, Dixson made an oral motion to set aside the verdict pursuant to New York Criminal Procedure Law ("C.P.L.") § 330.30, on the grounds that the prosecution had not proven beyond a reasonable doubt that he had the specific intent to steal or that he actually possessed a dangerous weapon, both elements of Robbery in the First Degree.  (*Id.* at 14).  Dixson also challenged Chavez's identification because Chavez had failed to notice certain of his distinctive features, such as his chipped tooth, freckles, and a mole on his nose.  (*Id.*).  The trial court denied the motion from the bench.  (*Id.* at 15).  At sentencing, Dixson received

---

[1]      The prosecution's case at trial included testimony from Chavez, Detective Green, Seguinot, Joel Boodhoo, who was on duty the night of the robbery as a security guard at the fish market, and Martin Guzman, who was recorded on surveillance footage operating a forklift that picked up Dixson at the fish market on the night of the robbery. (Report 10-13).  Boodhoo testified that Dixson drove a distinctive white Chevy Tahoe with a Delaware license plate.  (*Id.* at 11).  Seguinot testified that his review of the fish market's employee paperwork reflected that Dixson was a temporary fish market employee, and that he (Seguinot) had reviewed surveillance footage depicting a white Chevy exiting the fish market on the night of the robbery.  (*Id.* at 11-12).  Guzman testified that Dixson approached him on August 1, 2011, asking for a ride on a forklift so he could go home because there was no work.  (*Id.* at 13).

The defense called a single witness, Sergeant Brendan Duke, who testified that he spoke with Chavez on August 1, 2011.  (Report 13).  Duke recalled that when he spoke with Chavez, he could not identify the individual who robbed him because the robber "came up from behind him[.]"  (*Id.* at 14).

a term of 15 years in state prison, plus an additional five years of post-release supervision.  (*Id.*).

Dixson filed a timely appeal of his conviction to the Appellate Division, First Department, arguing that: (i) his conviction for Robbery in the First Degree was against the weight of the evidence; (ii) he had been identified from an unduly suggestive array and lineup; and (iii) his sentence of 15 years was excessive.  (Report 15).  Dixson also raised an ineffective assistance of counsel claim in a *pro se* supplemental brief, arguing that his trial counsel had failed to move the trial court to reopen the *Wade* hearing and, further, that the trial court had erred by proceeding to trial without requiring the prosecution to establish an independent source basis of identification from the sole witness. (*Id.*).  The Appellate Division unanimously affirmed Dixson's conviction and found the arguments in his *pro se* submission to be unavailing.  (*Id.* at 16).  Of particular note, the Appellate Division recognized that any "taint from any unduly suggestive identification procedures" had "dissipated by the passage of time." (*Id.*).

Dixson initially sought leave to appeal to the New York Court of Appeals on March 20, 2017.  (Report 16).[2]  On April 18, 2017, Dixson filed a supplemental letter with the New York Court of Appeals, with assistance from the Office of the Appellate Defender, which letter argued that leave to appeal should be granted to reconsider the existing law establishing that the passage

---

[2]     Dixson's March 20, 2017 letter is not included in the record on this Petition.

of time, alone, can dissipate the taint from suggestive identification procedures. (*Id.*).  On June 5, 2017, the New York Court of Appeals denied Dixson leave to appeal.  (*Id.*).

On September 11, 2018, Dixson, proceeding *pro se*, filed the instant petition for a writ of *habeas corpus.*  (Dkt. #2; Report 17).  In the Petition, Dixson asserted the same three grounds for relief that he presented in appealing his conviction to the Appellate Division: (i) his conviction was against the weight of the evidence; (ii) the identifications procedures were unduly suggestive; and (iii) his sentence was excessive.  (Dkt. #2 at 16-18).  On November 26, 2018, the Court referred the matter to Magistrate Judge Netburn for a report and recommendation.  (Dkt. #10).

On January 8, 2019, Dixson submitted a letter requesting a stay of the proceedings to allow him to return to state court to exhaust certain of his unexhausted claims.  (Dkt. #11).  In particular, Dixson sought to exhaust his claims for: (i) ineffective assistance of counsel; (ii) improper jurisdiction to commence a criminal action; (iii) a jury violation; (iv) a *Brady* violation; and (v) misrepresentation and/or fraudulent testimony used to induce a criminal conviction.  (*Id.* at 1).  Judge Netburn granted Dixson's request to stay the action on January 28, 2019.  (Dkt. #15).  In her order, Judge Netburn noted that Dixson had filed a Freedom of Information Law ("FOIL") request with the Bronx County District Attorney's Office, which request remained outstanding, and therefore had established good cause for his failure to exhaust his state court claims.  (*Id.* at 1).  Judge Netburn directed Dixson to file a C.P.L.

§ 440.10 motion to vacate the state court judgment within 30 days of the filing of this order and to advise the Court within 30 days after his state court exhaustion is complete.  (*Id.* at 2).

By letter dated May 4, 2019, Dixson informed the Court of his efforts to retrieve documents from the Bronx County District Attorney's Office and included an attachment indicating that on April 23, 2019, the office had granted in part and denied in part his FOIL request.  (Dkt. #19 at 2-4).  The Bronx County District Attorney's Office denied Dixson's request to the extent he was seeking grand jury and trial minutes.  (*Id.* at 3).  On May 23, 2019, Judge Netburn determined that Dixson's stated intention to appeal the Bronx County District Attorney's FOIL decision was not reason to further delay the proceedings and directed Dixson to file a C.P.L. § 440.10 motion within 30 days.  (Dkt. #20).  Thereafter, on October 17, 2019, without receiving any correspondence from Dixson related to his C.P.L. § 440.10 motion, Judge Netburn ordered Dixson to provide a status update.  (Dkt. #21).  By letter dated October 30, 2019, Dixson responded that he was still seeking documents from the Bronx County District Attorney's Office.  (Dkt. #22).  On November 22, 2019, Judge Netburn lifted the stay of the proceedings and gave Dixson until December 30, 2019, to file a reply brief to explain his failure to file a C.P.L. § 440.10 motion by the court-ordered deadline.  (Dkt. #23).  On January 21, 2020, without a reply from Dixson, the Court deemed the Petition fully submitted and ripe for decision.  (Dkt. #24).

On August 31, 2021, Judge Netburn issued her 47-page Report, in which she recommended that the Court dismiss the Petition in its entirety. (Report 46). Judge Netburn recommended that the Petition be deemed timely and partially unexhausted. As to those of Dixson's claims that were exhausted, Judge Netburn recommended that only Dixson's claim challenging the suggestive identification procedures be considered exhausted, as this was the only argument that had been clearly presented to the New York Court of Appeals. (*Id.* at 23-26).

On this unexhausted claim of unduly suggested identification procedures, Judge Netburn recommended that the Court apply the Antiterrorism and Effective Death Penalty Act's ("AEDPA") deferential standard of review to the portion of the claim predicated on the purportedly suggestive lineup. (Report 27). Judge Netburn concluded that the Appellate Division had squarely addressed the suggestive nature of the lineup and that its finding that it was not unduly suggestive was fairly supported by the record and not an unreasonable application of established Supreme Court precedent. (*Id.* at 27, 30-33).

On the other hand, Judge Netburn recommended that AEDPA's deferential standard of review be found not to apply to the portion of Dixson's challenge to the identification procedures based on the unduly suggestive photo array because the Appellate Division had not addressed the photo array. (Report 27). As such, this portion of Dixson's claim should be reviewed *de novo*. (*Id.* at 28, 33). In assessing the suggestive nature *vel non* of the photo

7

array, Judge Netburn concluded that it was not unduly suggestive and that any taint in the photo array did not come from intentional conduct by the state, but rather by Seguinot, a private actor. (*Id.* at 34-35). Judge Netburn thus recommended dismissal of the entirety of Dixson's claim regarding the identification procedures. (*Id.* at 36).[3]

Next, Judge Netburn assessed Dixson's weight of the evidence claim and determined that it should be deemed unexhausted and procedurally barred. (Report 36-38). Judge Netburn reasoned that because Dixson had not presented this claim to the New York Court of Appeals, and because Dixson had not demonstrated cause for this failure or marshalled any new evidence supporting his actual innocence, this claim should be denied as procedurally barred from federal habeas review. (*Id.* at 38).[4]

With respect to Dixson's claim that his 15-year sentence was excessive, Judge Netburn recommended that this claim also be deemed unexhausted and procedurally barred. (Report 42-44). While Dixson presented this claim to the Appellate Division, he did not raise it before the Court of Appeals on direct

---

[3]     Judge Netburn separately noted that if the Appellate Division had addressed the photo array issue on the merits, she would have arrived at the same recommended conclusion by applying AEDPA's deferential standard of review. (Report 36 n.12).

[4]     In the alternative, Judge Netburn explained that if the Court were to find that Dixson had properly exhausted his weight of the evidence claim, the claim would not be cognizable because federal habeas relief is unavailable for asserted errors purely grounded in state law. (Report 39).

       Moreover, if the Court were to construe Dixson's argument as a federal due process violation predicated on legally insufficient evidence, Judge Netburn suggested that this claim nevertheless failed on the merits because the evidence at trial was sufficient for a rational trier of fact to find beyond a reasonable doubt that Dixson robbed Chavez. (Report 39-42).

appeal. (*Id.* at 43). Even if this claim had been presented to the New York Court of Appeals, Judge Netburn points out that Dixson's brief to the Appellate Division failed to make any reference to federal case law or Dixson's federal constitutional rights. (*Id.*). Without any mention of federal law or federal rights, the state court had no opportunity to evaluate his claim under federal law. (*Id.*). And because Dixson had not shown cause for the default that would allow the Court to address the merits of his unexhausted claim, Judge Netburn recommended that it be deemed procedurally barred on habeas review. (*Id.*).[5]

Next, Judge Netburn addressed Dixson's argument from his *pro se* supplemental brief to the Appellate Division that the trial court erred by failing to establish an independent source basis for identification. (Report 44). Judge Netburn determined that this claim had not been presented to the New York Court of Appeals and thus was unexhausted. (*Id.*). Just as with the previously analyzed claims, Dixson failed to justify his failure to exhaust, leading to Judge Netburn's conclusion that this claim should be deemed procedurally barred. (*Id.*).[6]

---

[5]    Judge Netburn suggested that even had Dixson's challenge to his sentence been exhausted, his sentence was within the range prescribed by state law and thus presented no federal constitutional issue cognizable on federal habeas review. (Report 43-44).

[6]    Dixson confronts issues even if the Court were to decide to reach the merits of this claim. (Report 44). Provided that "[a]n independent source is required only when a lineup is unduly suggestive," the trial court's decision not to examine an independent source after determining that the lineup was not unduly suggestive was not an unreasonable application of federal law. (*Id.* (quoting *Mathis* v. *Marshall*, No. 08 Civ. 3991 (LTS) (FM), 2012 WL 388539, at *22 n.12 (S.D.N.Y. Jan. 30, 2012), *report and recommendation adopted*, 2012 WL 2739873 (S.D.N.Y. July 9, 2012))).

Finally, Judge Netburn discussed Dixson's argument from his *pro se* Appellate Division brief that his trial counsel was ineffective in failing to seek to reopen the *Wade* hearing at trial.  (Report 45-46).  Dixson noted in the Petition that he did not appeal the Appellate Division's decision on his ineffective assistance of counsel claim because he was told by his appellate attorney that "an article 440.10 would be the appropriate vehicle to raise" the claim.  (*Id.* at 45 (quoting Dkt. #2 at 3, 5)).  However, Dixson failed to file a C.P.L. § 440.10 motion, even after being given a year to make such a filing.  (*Id.*).  Judge Netburn noted that there was no time limit for filing such a motion, meaning that his ineffective assistance of counsel claim was unexhausted, but not procedurally barred.  (*Id.*).  Judge Netburn suggested that the proper course was to delete this claim from the Petition to obviate the need to dismiss the entire Petition for presence of an unexhausted claim.  (*Id.* at 26, 45).

## DISCUSSION

A court may accept, reject, or modify, in whole or in part, the findings or recommendations made by a magistrate judge.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Grassia* v. *Scully*, 892 F.2d 16, 19 (2d Cir. 1989).  A court may also accept those portions of a report to which no specific, written objection is made, as long as the factual and legal bases supporting the findings are not clearly erroneous.  *See Ramirez* v. *United States*, 898 F. Supp. 2d 659, 663 (S.D.N.Y. 2012) (citation omitted).  A magistrate judge's decision is clearly erroneous only if the district court is "'left with the definite and firm conviction that a mistake has been committed.'"  *Easley* v. *Cromartie*, 532 U.S. 234, 242

(2001) (quoting *United States* v. *U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).
"A party's failure to object to a report and recommendation, after receiving clear
notice of the consequences of such a failure, operates as a waiver of the party's
right both to object to the report and recommendation and to obtain appellate
review." *Grady* v. *Conway*, No. 11 Civ. 7277 (KPF) (FM), 2015 WL 5008463, at
*3 (S.D.N.Y. Aug. 24, 2015) (citing *Frank* v. *Johnson*, 968 F.2d 298, 300 (2d
Cir. 1992)).

Because Dixson has not filed an objection to the Report, he has waived
his right to object and to obtain appellate review.  Even so, the Court has
reviewed the Report and finds that its reasoning is sound and it is grounded in
fact and law.  Having reviewed the record, the Court finds no clear error and
adopts the Report in its entirety.

## CONCLUSION

The Court agrees completely with Judge Netburn's detailed and well-
reasoned Report and hereby adopts its reasoning by reference.  Accordingly, it
is ordered that the Petition is DISMISSED with prejudice.

The Clerk of Court is directed to terminate all pending motions, adjourn
all remaining dates, and close this case.  The Clerk of Court is further directed
to mail a copy of this Opinion and Order to Petitioner at his address of record.

SO ORDERED.

Dated:   December 30, 2021
         New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

KIMADA DIXSON,

                                        Petitioner,

                    -against-

JAMIE LAMANNA, Superintendent of the
Green Haven Correctional Facility,

                                        Respondent.

-----------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:__ 8/31/2021 __
```

18-CV-08285 (KPF) (SN)

**REPORT &**
**RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE KATHERINE POLK FAILLA:**

     *Pro se* Petitioner Kimada Dixson ("Dixson") seeks a writ of habeas corpus pursuant to 28

U.S.C. § 2254 (the "Petition") to set aside a judgment of the New York State Supreme Court,

Bronx County, following a jury trial. I recommend that Dixson's Petition be DENIED in its

entirety.

**BACKGROUND**

I.     **Factual Background**

     A.  **The Underlying Offense**

     On August 1, 2011, at approximately 1:20 a.m., Freddy Chavez ("Chavez") was at the

Hunts Point Fish Market (the "fish market") to purchase fish for his job at a restaurant. Trial

Transcript ("Trial Tr.") at 3–4, 5.[1] Chavez was in one of the men's restrooms using a urinal when

_____

[1] "Trial transcript" refers to the transcript of the jury trial that resulted in Dixson's conviction, which can
be found at ECF No. 13, Ex. 19. The page numbers refer to the ECF-stamped page numbers at the top of
each page.

someone wrapped their arm around his shoulders and tried to put their hand in his pocket. Id. at 5. Chavez and his attacker struggled, and the attacker hit Chavez on the neck and tightened his grip. Id. at 9. The attacker then brought Chavez into a bathroom stall and "told [him] to be quiet or else he was going to kill [him]." Id. at 6. Chavez then felt what he later described as a fishhook against the right side of his stomach, which the attacker was holding with his right hand. Id. at 10, 39. At that point, Chavez remained still, and the attacker took about $2,000 in cash from an envelope in Chavez's pocket. Id. at 6, 43. The attacker kept the cash but threw away the envelope, which contained additional cash and a credit card. Id. at 6. Chavez reported that he sustained bruises to his lip and neck and "a little line" on his stomach for a "couple of weeks." Id. at 32.

After the attacker took the money, he ran from the bathroom, and Chavez chased after him. Id. at 11. The attacker then "came back" and told Chavez "not to call the police or anybody because he was going to kill [him]." Id. It was then that Chavez was able to see his attacker's face, though he had also gotten a glimpse when his attacker had left the bathroom. Id. at 11, 12. Chavez described his attacker as having a big beard with a face that was "a little fat," "dark"-skinned but not "very Black," and wearing a Yankees hat with a "uniform" of thick, black, heavy clothing and big shoes, typically worn because the fish market is cold. Id. at 12, 44, 59.

Chavez then went to the security office in the market, where he called 911 approximately ten minutes after the incident. Id. at 30, 40–41. With a Spanish interpreter, Chavez reported that he was attacked by a man with a "small knife."[2] Id. at 40. Chavez told the 911 operator that the robber was Puerto Rican because "the majority of the people who live [t]here are from Puerto Rico, and they're not Black, but they have darker skin." Id. at 44–45, 58.

---

[2] At trial, Chavez explained that he said "knife" and not "fishhook" because he had "never seen that" (the fishhook) and he "didn't know how to say it." Id. at 41–42.

**B.  The Investigation**

Several hours later, on August 1, 2011, Sergeant Brendan Duke of the New York Police Department ("NYPD") called Chavez by phone. Id. at 233. Sergeant Duke asked Chavez if he would be able to identify the robber; Chavez responded that he "wasn't sure" because the robber "came up from behind him." Id. at 234.

Independently, Victor Seguinot, the security director at the fish market and a former NYPD officer, began investigating the incident that same day. Id. at 126. Seguinot reviewed the fish market's video surveillance footage from around the time of the incident. Id. at 126–27. Seguinot was able to observe Chavez and a colleague in "Corridor C" of the fish market at around 1:21 a.m. that morning. Id. at 134. Seguinot also observed another individual who was dressed in a way that "reflected that he was an employee of the market." Id. Separate video surveillance footage showed a forklift driver—who turned out to be Martin Guzman—talking to another individual and then driving the forklift west. Id. at 132. Some of the video footage was preserved and later used at trial; additional footage that Seguinot viewed was not saved and was recorded over by the system. Id. at 5, 141.

According to Seguinot, the video footage that was not preserved showed the forklift moving west with a passenger, and then moving back towards Corridor C without a passenger. Id. at 143. Other video footage showed a white Chevy suburban "quickly move out of the facility toward the toll plaza" to exit the fish market. Id. at 142. Seguinot also viewed video from a plate reader camera that recorded the license plate of the white Chevy suburban. Id. at 144–45. As a part of his investigation, Seguinot also spoke with Guzman and Joel Boodhoo, who worked as a security guard at the fish market. Id. at 114, 139, 156. Three days after the robbery, Seguinot met

with Chavez in his office and showed him two single photos of the suspected robber, Dixson. Id. at 148.

NYPD Detective Margo Green of the 41st Precinct was assigned to the case "some time" after the robbery. Id. at 63; ECF No. 13, Ex. 15 ("Hearing Tr.") at 6. Detective Green spoke with Seguinot, and he provided her with some video surveillance footage from the fish market. Trial Tr. at 67, 148; Hearing Tr. at 10, 38.

Chavez participated in a police-arranged photo array on August 11, 2011, at which he identified Dixson as the person who robbed him. Hearing Tr. at 19; see ECF No. 13, Ex. 1 (Photo Array). The photo of Dixson used in the array was one of the photos Chavez was shown by Seguinot a week earlier. Several months later, on October 28, 2011, Chavez was called to the police station to view a lineup, and he again identified Dixson as his assailant. Hearing Tr. at 23–24. Immediately thereafter, Dixson was placed under arrest for the August 1, 2011 robbery. Id. at 63–64.

### C. The Trial

#### 1. Pre-Trial Evidentiary Hearing

Dixson was indicted by a Bronx County grand jury on November 15, 2011. The grand jury charged him with First-Degree Robbery, Second-Degree Robbery, Third-Degree Robbery, Second-Degree Assault, two counts of Fourth-Degree Grand Larceny, Fourth-Degree Criminal Possession of Stolen Property, Petit Larceny, Fifth-Degree Criminal Possession of Stolen Property, Third-Degree Assault, and Fourth-Degree Criminal Possession of a Weapon. ECF No. 13 at ¶ 5.

Before trial, Dixson, through counsel, moved to suppress identification evidence. See ECF No. 13, Ex. 3 at 1. Supreme Court Justice James M. Kindler conducted a hearing pursuant

to United States v. Wade, 371 U.S. 218 (1967), Dunaway v. New York, 442 U.S. 200 (1979), and Payton v. New York, 445 U.S. 573 (1980), that lasted several days and concluded on April 24, 2013. Id. Defense counsel sought to exclude Chavez's identifications from the photo array and lineup on the basis that they were unduly suggestive. See id.; ECF No. 13, Ex. 5 at 10[3] (part one of Petitioner's Appellate Division brief); see generally Hearing Tr. Defense counsel also argued that the photo array and lineup were tainted by the fish market security director's two single photo show-ups. Hearing Tr. at 108. Defense counsel also argued that Dixson's arrest at the men's shelter where he was residing was unconstitutional because the police did not have a warrant to enter his room and no valid exception to the warrant requirement existed. See ECF No. 13, Ex. 3 at 8.

At the Wade hearing, Detective Margo Green testified that she investigated a robbery that occurred at the fish market on August 1, 2011. Hearing Tr. at 6, 9–10. She testified that the complainant, Chavez, had stated that he was "accosted" inside one of the men's restrooms at the fish market by someone who placed a sharp object to his stomach and demanded his money. Id. at 10. Detective Green explained that, according to the complaint report generated after the incident, Chavez had reported to the responding patrol officer that the robber was a Black Hispanic male with medium skin tone, approximately 30 years old, 5'10" tall, and weighing 220 pounds. Id. at 70–71.

Detective Green also testified that as a part of her investigation, she spoke with Seguinot, the fish market security director who conducted his own investigation into the robbery.[4] Id. at

---

[3] The state record filed by the Respondent divided Petitioner's counseled brief before the Appellate Division into three parts, across ECF No. 13, Exhibits 5 through 7. Because the brief is in three parts, the page numbers refer to the ECF-stamped page numbers.

[4] Seguinot did not testify at the suppression hearing but did testify at trial.

10–11. Detective Green testified that she did not know that Seguinot was a former NYPD officer, and that his investigation was not conducted at the NYPD's direction. Id. at 11, 38.

Detective Green testified that she learned that Seguinot had met with Chavez in his office and showed him two photographs of Dixson. Id. at 11–12. Seguinot apparently showed Chavez the photos of Dixson one at a time. Id. at 13. The first was Dixson's photo ID from the fish market. See id. at 99. The second photograph was a photo of Dixson's driver's license, but Detective Green believed that only the photo, and not the text of the license, was shown to Chavez. Id. at 47, 48. Detective Green testified:

> [PROSECUTOR]: Now, when that photograph was shown to the complainant, are you aware whether Mr. Seguinot said anything to the complainant when he showed him?
>
> [DET. GREEN]: Yes. He asked the complainant, I'm going to show you a photo and I want you to look at the photo. You may or may not recognize the person. And when he showed him the photo, the complainant stated that he recognized the photo, the person on the photo.
>
> Q: Did he say that was the person that robbed him?
>
> A: Yes, he did.
>
> Q: After that photo was shown, did Mr. Seguinot immediately display the second photograph to the complainant?
>
> A: Yes.
>
> . . .
>
> Q: And when Mr. Seguinot displayed the second photograph to the complainant, are you aware whether he gave any instructions or said anything to the complainant regarding the second photograph?
>
> A: He just asked him to look at the second photograph as well and said that he may or may not recognize him. He looked at the photograph, which is the complainant, looked at the photograph and said, yes, that's him.

> Q: And when he said, yes, that's him, was he referring to the defendant?
>
> A: Yes.
>
> Q: Was he referring to the person who accosted him?
>
> A: In the bathroom, yes.

Id. at 14–15.

Detective Green further testified that, based on her conversations with Seguinot, she learned that there was video surveillance that recorded a portion of the incident and that Seguinot had viewed this footage in order to determine Dixson's identity. Id. at 71–72.

Detective Green testified that on August 4, 2011, she created an I-card for Dixson, which is akin to an arrest warrant, but was marked as "suspect only, no probable cause to arrest." Id. at 29–30, 65–67. Detective Green also testified that on August 10, 2011, at approximately 7:30 p.m., Detective Edith Rodriguez and Sergeant Carl Root visited Chavez at his workplace to conduct a photo array. Id. at 16. Detective Green explained that Sergeant Root used the photograph of Dixson's driver's license and put it into the NYPD's ECMS photo management system to obtain photographs of individuals with similar characteristics to him. Id. at 16–17. This DMV photo was the same photo of Dixson that Chavez had been shown six days earlier by Seguinot. Id. at 16, 47. Sergeant Root did not use Dixson's mug shot, which was already in the system, because it was outdated and did not accurately portray Dixson as he looked in August 2011. Id. at 18. Detective Green testified that Detective Rodriguez and Sergeant Root told Chavez that "they were going to show him a set of photos of six pictures for him to look at it and look at carefully, and if he [could] identi[f]y, to let them know by pointing to the individual." Id. at 18–19. Detective Green asserted that no "particular person" was suggested to Chavez. Id. at 19. When he viewed the photo array, Chavez pointed to the photograph in position one, showing

7

Dixson, and said "that's him," identifying him as the robber. Id.; see ECF No. 13, Ex. 1 (Photo Array). Detective Green testified that she did not know that Chavez had already seen two photographs of Dixson by the time the photo array was conducted. Hearing Tr. at 21, 29.

Detective Green explained that on October 28, 2011, Dixson was brought into police custody between 7:00 and 7:30 a.m., and then a lineup was arranged at 1086 Simpson Street at approximately 9:15 p.m. Id. at 21, 28. Detective Green called Chavez to "come down to look at some individuals and if he would be able to identify the person that accosted him in the bathroom and took his money." Id. at 22. The lineup consisted of Dixson and other individuals— "fillers"—who were obtained based on Dixson's age and general description. Id. at 22, 160. Detective Green testified that Dixson was 35 years old at the time of the lineup, but that none of the other fillers was in their 30s, and the closest person in age to Dixson was ten years older. Id. at 52–53, 55. Dixson also weighed 220 pounds and the filler closest in weight was 260 pounds, while four fillers weighed 160 pounds. See id. at 52, 55, 61.

Detective Green testified that after she and her partner transported Chavez to the location of the lineup, Chavez was kept away from Dixson and the fillers before the lineup. Id. at 23. Detective Green testified that Chavez was not told that "the individual he previously identified through a photo would be in the lineup." Id. Detective Green further explained that Dixson was given the opportunity to pick his seat for the lineup, and he chose seat one. Id. She testified that Chavez picked out seat number one, Dixson, from the lineup. Id. at 23–24; see ECF No. 13, Ex. 2 (Lineup). Dixson was placed under arrest following his identification at the lineup. Hearing Tr. at 28.

Chavez also testified at the suppression hearing. He testified that on October 28, 2011, the police called him to tell him "they had captured someone," and that they wanted him to

8

"come down to see the line of suspects." Id. at 158, 160. Chavez explained that he "recognized [Dixson] because [he] had seen his face a little bit when he robbed [Chavez] and a lot of time had not gone by since he had done this." Id. at 161.

Dixson testified at the suppression hearing and addressed the circumstances of his arrest. Id. at 76–88.

The Honorable James M. Kindler denied the motion to suppress from the bench. See Hearing Tr. at 170–71. He later issued a written opinion, holding that the photo array was not unduly suggestive. ECF No. 13, Ex. 3 at 5. It was "apparent that the photos depicted men with similar facial features and skin tone," and "any dissimilarities, if any, in height, weight and stature could not be determined." Id.; see ECF No. 13, Ex. 1. Further, "[a]lthough [Dixson's] driver's license photo was used, while the other five photos were mugshots obtained through the NYPD photo management system, that distinction is not readily discernible from viewing the array." ECF No. 13, Ex. 3 at 5. The trial court further found unpersuasive Dixson's argument that the photo array was tainted because it contained his driver's license photo, which Seguinot had previously shown to Chavez as part of his own investigation for the fish market. Id. at 5 n.2. The court observed that Seguinot was a private citizen who had not acted "at the behest of or in conjunction with the NYPD," and the police did not know about his single photo show-ups, therefore, there was no Wade violation. Id. Additionally, Seguinot showed Chavez a black and white photocopy of Dixson's driver's license, which was "vastly different" from the blown-up color image of just Dixson's face that the detectives used for the array. Id.

Justice Kindler also concluded that the lineup was not unduly suggestive. Id. at 6. The participants all had "similar facial features and skin tones," "varying degrees and types of facial hair," and they all wore a black baseball cap. Id. The court noted that "[a]ny dissimilarities in

other physical features were eliminated" because the participants' "hair and bodies from the chest down were covered." Id.; see ECF No. 13, Ex. 2. Justice Kindler concluded that nothing about the lineup procedures "singled [Dixson] out from among the lineup participants." ECF No. 13, Ex. 3 at 6. Even assuming a detective told Chavez beforehand that they had caught the robber, the trial court affirmed that nothing said to Chavez rendered the photo array or the lineup unduly suggestive. Id. at 6–7. The court also noted that, when asked to view a lineup, many complainants "assume from that fact alone that the police have a suspect in custody." Id. at 7.

The court concluded that there was no Dunaway violation because Dixson's arrest following Chavez's identification in the photo array and lineup was supported by probable cause. Id. at 7–8.

Lastly, the court determined that there was no Payton violation; and even if there had been, suppression of the lineup was not appropriate. Id. at 9–10.

### 2. The Prosecution's Case

The jury trial began on May 6, 2013, before Justice Kindler. See generally Trial Tr. The first witness to testify for the State was Chavez. Id. at 3. In addition to recounting the details of the robbery, Chavez stated that he did not get to see the robber face-to-face "a lot." Id. at 11. Chavez was unable to identify Dixson in the courtroom as "a lot of time ha[d] passed" and he didn't "really recognize too much." Id. He was, nevertheless, able to recognize himself and the perpetrator on video surveillance footage from the night of the robbery, which was shown to the jury. Id. at 16–17, 25–27. He stated that he recognized the person seated in position one of the lineup as Dixson, "[f]rom his face and his beard,"[5] and that he was "a hundred percent sure" that the person he chose was the robber. Id. at 34, 59.

---

[5] In fact, Dixson did not have a beard at the time of the lineup. See ECF No. 13, Ex. 2.

Detective Green's testimony at trial tracked her testimony at the pre-trial hearing. See supra Section I(C)(1); Trial Tr. at 65–71, 74–78. She further testified that she located Dixson's vehicle, a white 1995 Chevrolet Tahoe sports utility car. Trial Tr. at 71–72, 74.

The jury heard testimony from Joel Boodhoo, who worked as a night security guard at the fish market and who was on duty at the time of the incident. Id. at 114, 118–19. Boodhoo explained that individuals could enter the fish market through a turnstile or the toll plaza, and he was working at the toll plaza on August 1, 2011. Id. at 114–15. Boodhoo testified that he "always recognize[d]" Dixson when he came to the fish market and identified him in the courtroom. Id. at 115–17. He further testified that he saw Dixson drive a "two-door white Chevy Tahoe" "a lot of times," and that it was distinctive as an older model with a Delaware license plate. Id. at 116–17. Boodhoo stated that he did not see Dixson at the fish market after August 1, 2011. Id. at 118. He also commented that employees typically leave the market after 8:00 a.m. Id. at 119.

The jury also heard from Victor Seguinot, the security director of the fish market. Id. at 124. Seguinot testified that after he learned of the robbery, he initiated his own investigation and looked at the fish market's video surveillance system. Id. at 127–28. He explained that the video surveillance footage stays on the system for 30 days before it is automatically deleted, and that he viewed, but did not save, some of the surveillance footage from the night of the robbery. Id. at 129, 165. The prosecution played video surveillance footage from the morning of the robbery, and Seguinot identified the individual who followed Chavez, then Chavez entering the restroom without his assistant, and the robber later leaving on a forklift. Id. at 132–36. Seguinot admitted that he could not make out the face of the robber. Id. at 166. He also testified that he could tell the robber was an employee of the market because of his attire. Id. at 135–37.

Seguinot described the deleted video surveillance footage, explaining that it depicted a white Chevy suburban vehicle exit the fish market. Id. at 143. He noted that the car exited the facility approximately a minute after the forklift left an individual at the west end of the complex. Id. at 145, 152–55. He wrote down the Delaware license plate that the plate reader at the toll plaza registered. Id. at 145–46.

He further testified that he met with Chavez in his office about three days after the robbery. Id. at 148. He testified that he had reviewed the fish market's employee paperwork and had determined that Dixson was a fish market employee, albeit a temporary employee who had worked on and off for years. Id. at 149, 161.

Seguinot explained that as a part of his investigation, he spoke to Boodhoo about the vehicle and confirmed that Dixson never returned to the fish market after August 1, 2011. Id. at 156–57. He testified that fish market employees would sling large fishhooks over their shoulders and carry smaller hooks in their waistbands or in their pockets. Id. at 158. He added that he was not aware of whether there is a particular time of year that is considered slow at the market. Id. at 155.

Joe Vasquez was the official court stenographer at the grand jury panel where Dixson testified. Id. at 180. He read portions of Dixson's grand jury testimony into the record at trial. See id. at 181–98. Vasquez read the portion of Dixson's testimony where Dixson stated that he went into the fish market's restroom at around "1 o'clock, maybe 2'ish"[6] on August 1, 2011, and saw an individual talking to himself. Id. at 192. Dixson had also testified at the grand jury that he was working at the market that early morning and was wearing his uniform of boots, dark gray

---

[6] At the Grand Jury, the Assistant District Attorney incorrectly asked Dixson about being at the fish market at 1:30 p.m. instead of at 1:30 a.m. See Trial Tr. at 186. The incident, however, occurred around 1:30 a.m.

pants, and an all-black Yankees cap. Id. at 189. As a salesman or journeyman at the market, he

carried crayons, chalk, receipts, and fishhooks. Id. at 191. Dixson testified that he drove a 1995

white Chevy Tahoe. Id. at 193. He also testified that because of the drought that runs from

August to November, he did not return to work at the fish market after August 1, 2011. Id. at

193, 195, 197.

      Martin Guzman, who drove the forklift that picked up Dixson at the fish market, also

testified. Guzman identified Dixson in the courtroom as the person to whom he had given a ride

the night of August 1, 2011. Id. at 215–16, 224. Guzman stated that had seen Dixson about 20

times before August 1, 2011, and knew him by face and nickname. Id. at 223–24. The prosecutor

played a surveillance video from the fish market, and Guzman identified himself, his forklift, and

Dixson on the surveillance video. Id. at 217–18. Guzman also testified that Dixson had

approached him on August 1, 2011, and had asked him to take him to the turnstile so he could

"go home because there was no work" Id. at 218. Guzman explained that he dropped Dixson off

at the west end of the facility after a minute-and-a-half ride. Id. at 218, 220. Guzman did not see

what happened before he picked up Dixson and admitted to giving many people rides during the

ten years that he worked at the fish market. Id. at 219, 221. He also testified that many workers at

the fish market wore heavy jackets, boots, and Yankees caps. Id. at 222–23.

     **3.  The Defense's Case**

      The defense called only one witness—Sergeant Brendan Duke, who was assigned to the

41st Precinct Detective Squad. Id. at 234–35. Sergeant Duke testified that he spoke with Chavez,

without an interpreter, over the phone at approximately 12:35 p.m. on August 1, 2011. Id. at 235,

237. He did not recall experiencing any difficulty communicating with Chavez. Id. at 238.

Sergeant Duke testified that he asked Chavez whether he could identify the robber, and that

Chavez had responded that "he wasn't sure" because the robber "came up to him from behind and he remember[ed] seeing the perp was dressed in black." Id. at 236. Sergeant Duke stated that based on his experience, it is common for individuals to admit that they are unsure whether they can identify a perpetrator. Id. at 238. Sergeant Duke acknowledged that he was not the detective assigned to the case and that his involvement with the case was minimal. Id. at 237.

### 4. The Jury Verdict and Sentence

Defense counsel moved to dismiss Count 1, Robbery in the First Degree; Count 11, Criminal Possession of a Weapon in the Fourth Degree; Count 2, Robbery in the Second Degree; Count 4, Assault in the Second Degree; and Count 10, Assault in the Third Degree. Id. at 226–28. The trial court submitted to the jury Robbery in the First Degree and Robbery in the Third Degree, and allowed the jury to stop at Robbery in the First Degree if it found Dixson guilty, and dismissed all other counts. ECF No. 13, Ex. 20 at 5, 7 (trial summation and verdict transcript).

The jury returned its verdict on May 10, 2013, finding Dixson guilty of first-degree robbery. Id. at 102–04. On May 28, 2013, after the jury returned its verdict and before sentencing, Dixson (not his attorney) made an oral motion to set aside the verdict based on testimony in the record pursuant to New York Criminal Procedure Law (hereinafter "CPL") § 330.30. Id. at 115–18. Dixson argued that the prosecution did not prove beyond a reasonable doubt that he had specific intent to steal and that he actually possessed a dangerous weapon, both elements of the crime of Robbery in the First Degree. Id. at 119; see N.Y. Penal L. § 160.15. Dixson also questioned Chavez's identification, arguing that he has "unique noticeable characteristics about [his] face," such as a chipped tooth, freckles, and a noticeable mole on the side of his nose, such that he found it "hard to believe that anyone who saw [him] up close wouldn't notice them." ECF No. 13, Ex. 20 at 121.

The trial court denied the motion from the bench. Id. at 127. The court found the evidence at trial to be more than legally sufficient and that there had been "a very conscientious jury." Id. at 123–27. The court acknowledged that Chavez did not identify Dixson in court, but did identify him in the lineup, and that the jury determined how much weight to afford that identification. Id. at 124.

At sentencing, the trial court denied the prosecution's application to have Dixson declared a discretionary persistent felon and instead found him to be a predicate felon, based on his past criminal record.[7] Id. at 145, 163. The trial court sentenced Dixson as a second felony offender to a determinate term of 15 years in state prison, plus an additional five years of post-release supervision. Id. at 169.

### 5. Dixson's Direct Appeal

With the assistance of counsel, Dixson appealed his conviction to the Appellate Division, First Department, arguing that (1) his conviction for robbery in the first degree was against the weight of the evidence; (2) he was identified from an unduly suggestive array and lineup; and (3) his sentence of 15 years is excessive. See ECF No. 13, Exs. 5–7 (Appellant's Brief). Dixson also raised an ineffective assistance of counsel claim in a *pro se* Supplemental Brief before the Appellate Division, arguing that his trial attorney failed to move the trial court to reopen the Wade hearing, and argued that the trial court erred by proceeding to trial without allowing the prosecution to establish an independent source basis of identification from the sole witness. See ECF No. 13, Ex. 10.

---

[7] In 1994, Dixson pleaded guilty to Grand Larceny in the Fourth Degree, N.Y. Penal L. § 155.30(1), and Intent to Obtain Transportation Without Paying, N.Y. Penal L. § 165.15(3). See ECF No. 13, Ex. 7 at 2 n.7. In 1996, he pleaded guilty to the violation of Unlawful Possession of Marijuana and to Attempted Criminal Sale of a Controlled Substance in the Third Degree, N.Y. Penal L. § 110/220.39. Id. In 1999, he pleaded guilty to a second count of Attempted Criminal Sale of a Controlled Substance in the Third Degree and to Assault in the Third Degree, N.Y. Penal L. § 120.00(1). Id.

The Appellate Division unanimously affirmed the Dixson's conviction. People v. Dixson, 147 A.D.3d 484 (1st Dep't 2017). The Appellate Division held that the trial court properly denied Dixson's motion to suppress Chavez's identification of Dixson in the lineup. Id. at 484. While recognizing a "taint from any unduly suggestive identification procedures," the Appellate Division concluded that it had "dissipated by the passage of time." Id. (first citing People v. Perez, 128 A.D.3d 465, 465 (1st Dep't 2015); and then citing People v. Mathis, 94 A.D.3d 428 (1st Dep't 2012)). The Appellate Division also determined that there was no issue with the lineup fillers because they "did not differ so much from defendant's appearance or the victim's description of the perpetrator as to single out defendant unfairly." Id. The court further concluded that the verdict was not against the weight of the evidence, and there was "no basis for disturbing the jury's credibility determinations." Id. The dangerous instrument element of the crime was established by Chavez's testimony that the perpetrator used a fishhook. Id. Finally, the Appellate Division perceived no basis for reducing Dixson's sentence and found the arguments in his *pro se* supplemental brief unavailing. Id. at 485.

The record does not include Dixson's initial letter seeking leave to appeal to the Court of Appeals, dated March 20, 2017, but it does include a supplemental letter dated April 18, 2017, filed on Dixson's behalf by the Office of the Appellate Defender. ECF No. 13, Ex. 12. Dixson's supplemental letter seeking leave to appeal, submitted by counsel, argued that leave to appeal should be granted to reconsider existing law that stands for the proposition that the passage of time alone can dissipate the taint from suggestive identification procedures. Id. at 9.[8]

On June 5, 2017, the New York Court of Appeals denied leave to appeal. See People v. Dixson, 29 N.Y.3d 1078 (2017).

---

[8] Respondent does not argue that the Petition should be dismissed on the grounds that any of its claims were not preserved in Dixson's letter seeking leave to appeal. See ECF No. 14.

## II.     Dixson's Federal Habeas Petition

On September 11, 2018, Dixson filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. ECF No. 2 ("Pet."). Dixson's Petition argues three grounds for relief: (1) his conviction for robbery in the first degree was against the weight of the evidence; (2) he was identified from an unduly suggestive array and lineup; and (3) his sentence of 15 years is excessive. <u>See</u> Pet. at 16–18. Those claims in the Petition are similar to those raised in Dixson's counseled briefing before the Appellate Division, including nearly identical language in its point headings, and Respondent's opposition addresses the Petition's claims as they were presented to the Appellate Division. <u>See</u> ECF No. 14. at 3, n.1.

On January 8, 2019, the Court received a letter from Dixson requesting a stay in the matter so that he could return to state court to exhaust some of his previously unexhausted claims. ECF No. 11. Specifically, Dixon sought to exhaust the following claims: (1) ineffectiveness of counsel, (2) improper jurisdiction to commence a criminal action, (3) jury violation, (4) <u>Brady</u> violation, and (5) "misrepresentation and/or fraudulent testimony used to induce a criminal conviction." <u>Id.</u> at 1.

On January 28, 2019, the Court granted Dixson's request to stay the case. <u>See</u> ECF No. 15. The Court directed Dixson to file a CPL § 440.10 motion within 30 days of the order and file proof that he had done so. <u>Id.</u> at 2. The Court further ordered Dixson to alert the Court 30 days after his additional state court proceedings had concluded. <u>Id.</u> On March 6, 2019, the Court granted Dixson an additional 60 days to file his CPL § 440.10 motion due to his pending Freedom of Information Law lawsuit against the Bronx County District Attorney's Office for case-related paperwork. ECF No. 18.

Dixson's May 14, 2019 letter indicated that his request to the Bronx County District Attorney's Office had been resolved on April 23, 2019, and accordingly, the Court directed him to file a motion pursuant to CPL § 440.10 within 30 days of its May 23, 2019 Order. See ECF No. 20.

On October 17, 2019, the Court ordered Dixson to provide an update on the status of his CPL § 440.10 motion. ECF No. 21. By letter filed on November 13, 2019, Dixson asserted that he was still seeking documents from the Bronx County District Attorney's Office. See ECF No. 22. Noting that Dixson had yet to file his CPL § 440.10 motion, the Court lifted the stay on the litigation on November 22, 2019. ECF No. 23. When Dixson did not file a reply by the stated deadline, the Court deemed the Petition fully submitted and ready for decision. ECF No. 24. Dixson has not filed any applications with the Court since then.

## DISCUSSION

### I.     Legal Standards

#### A.   *Pro se* Filing

Courts liberally construe pleadings prepared by *pro se* litigants and hold them "to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)). It is appropriate to interpret *pro se* submissions to raise the strongest arguments that they suggest. Gomez v. Brown, 655 F. Supp. 2d 332, 342 (S.D.N.Y. 2009) (explaining that because of the right of self-representation, the court is obligated to make reasonable allowances to protect *pro se* litigants from "inadvertent forfeiture of important rights because of their lack of legal training" (quoting Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983))).

### B.  Habeas Standard of Review

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the standard of review of a federal habeas corpus petition "depends upon whether the petitioner's claims have previously been 'adjudicated on the merits' by a state court." Spears v. Greiner, 459 F.3d 200, 203 (2d Cir. 2006); see 28 U.S.C. § 2254(d). An "adjudication on the merits" is one that "(1) disposes of the claim 'on the merits', and (2) reduces its disposition to judgment." Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001); accord Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007). "In applying this two-part test," the Court of Appeals has directed courts to consider:

> (1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state court's opinion suggests reliance upon procedural grounds rather than a determination on the merits.

Norde v. Keane, 294 F.3d 401, 410 (2d Cir. 2002) (quoting Sellan, 261 F.3d at 314) (internal quotation marks omitted).

Where a claim has been "adjudicated on the merits" in state court, a federal court on habeas review must determine whether the state court's determination was (1) "contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts." 28 U.S.C. §§ 2254(d)(1)-(2); see Johnson v. Williams, 568 U.S. 289, 292 (2013); Spears, 459 F.3d at 203. A state court decision is "contrary to [the Supreme Court's] clearly established precedents if it applies a rule that contradicts the governing law set forth in" Supreme Court precedent, "or if it confronts a set of facts that is materially indistinguishable from a decision of [the] Court but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (first

19

citing Williams v. Taylor, 529 U.S. 362, 405 (2000); and then citing Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam)). A state court decision constitutes an "unreasonable application" of the Supreme Court's precedent if "the state court applies [that Supreme Court] precedents to the facts in an objectively unreasonable manner." Id. (first citing Williams, 529 U.S. at 405; and then citing Woodford v. Visciotti, 537 U.S. 19, 24–25 (2002) (per curiam)). Thus, in these circumstances, a state court's determination is afforded deferential review. See Harrington v. Richter, 562 U.S. 86, 104 (2011). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007); see also Parker v. Matthews, 567 U.S. 37, 38 (2012) (per curiam) (quoting Renico v. Lett, 559 U.S. 766, 779 (2010)) (explaining that AEDPA prohibits "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts"). A state court's factual findings are "presumed to be correct" absent "clear and convincing evidence" otherwise. 28 U.S.C. § 2254(e)(1). When applying these standards of habeas review, the court reviews the state court's "last reasoned decision." Ylst v. Nunnemaker, 501 U.S. 797, 804 (1991).

On the other hand, if the state court did not adjudicate the federal claim on the merits, "AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed de novo." Spears, 459 F.3d at 203 (citing DeBerry v. Portuondo, 403 F.3d 57, 66–67 (2d Cir. 2005)); see Cochran v. Griffin, No. 9:18-cv-00175 (LEK) (TWD), 2021 WL 1223848, at *4 (N.D.N.Y. Mar. 31, 2021) ("Where there is no reasoned decision of the state court addressing the ground or grounds raised on the merits and no independent state grounds exist for not addressing those grounds, this [c]ourt must decide the issues de novo on the record before it." (citations omitted)).

Regardless of the level of deference a court applies to the state court's decision, a court must first determine whether the petitioner has cleared numerous procedural hurdles. Two of those hurdles are timeliness and exhaustion.

**C.  Timeliness**

An application for a writ of habeas corpus must be filed within one year of a petitioner's conviction becoming final "by the conclusion of direct review or expiration of time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). A judgment of conviction becomes final following the expiration of the period of time to petition for *certiorari* to the Supreme Court of the United States, which is 90 days after the highest court of the state completed direct review. Catala v. Bennet, 273 F. Supp. 2d 468, 471 (S.D.N.Y. 2003).

**D.  Exhaustion**

Before seeking a federal writ of habeas corpus, a petitioner must exhaust all available state remedies. See 28 U.S.C. § 2254(b)(1)(A). This requires a petitioner to "fairly present" his or her claim to the highest state court, "thereby alerting that court to the federal nature of the claim." Baldwin v. Reese, 541 U.S. 27, 29 (2004); see also Jackson v. Conway, 763 F.3d 115, 133 (2d Cir. 2014) ("While 'a state prisoner is not required to cite chapter and verse of the Constitution in order to satisfy this requirement,' he must tender his claim 'in terms that are likely to alert the state courts to the claim's federal nature.'" (quoting Carvajal v. Artus, 633 F.3d 95, 104 (2d Cir. 2011))). Although express reference to a constitutional claim is the clearest way to "fairly present" that claim in state court, courts have also "consider[ed] that a defendant who cites state precedent that employs pertinent constitutional analysis has adequately put the state courts on notice of the constitutional thrust of his claim." Daye v. Att'y Gen. of N.Y., 696 F.2d 186, 194 (2d Cir. 1982) (en banc).

21

If a petitioner sought to exhaust his state remedies by returning to state court and that court then found "the claim barred by the application of a state procedural rule," then that claim will be deemed "procedurally defaulted." Jackson, 763 F.3d at 133 (quoting Carvajal, 633 F.3d at 104). This is because a federal court will not evaluate "the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule." Martinez v. Ryan, 566 U.S. 1, 9 (2012).

When a petition is mixed—containing both exhausted and unexhausted claims—a federal court can take several different courses of action: (1) stay the petition pending the complete exhaustion of all claims; (2) dismiss the petition without prejudice pending total exhaustion; or (3) consider only the exhausted claims and delete the unexhausted claims. Zarvela v. Artuz, 254 F.3d 374, 380–82 (2d Cir. 2001); see also Rhines v. Weber, 544 U.S. 269, 275 (2005) ("[A] district court [can] stay the petition and hold it in abeyance while the petitioner returns to state court to exhaust his previously unexhausted claims."). If granting a stay and abeyance is inappropriate, "the court should allow the petitioner to delete his unexhausted claims and to proceed with just the exhausted claims if dismissal of the entire petition would unreasonably impair the petitioner's right to obtain federal relief." Rhines, 544 U.S. at 278. Such an unreasonable impairment "is principally informed by whether AEDPA's one-year statute of limitations has already expired or will do so shortly." Wesley-Rosa v. Kaplan, 274 F. Supp. 3d 126, 129 (E.D.N.Y. 2017); see Young v. Great Meadow Corr. Facility Superintendent, No. 16-cv-01420 (PAE) (BCM), 2017 WL 480608, at *4 (S.D.N.Y. Jan. 10, 2017) (dismissal of the entire petition is "likely fatal where . . . the statute of limitations has already run (or where insufficient time remains for exhaustion before the statute runs)"). On the other hand, the court may exercise "its discretion to presume—unless the petitioner expressly indicates otherwise—

that he would rather delete his unexhausted claims than see his entire petition dismissed without

regard to the merits of the exhausted claims." <u>Young</u>, 2017 WL 480608, at *5.

**II.     Dixson's Petition is Timely and Partially Unexhausted**

    **A.     Timeliness**

      The New York Court of Appeals denied Dixson leave to appeal on June 5, 2017. <u>See</u>

<u>Dixson</u>, 29 N.Y.3d 1078. Accordingly, his conviction became final on September 5, 2017, and

he had until September 5, 2018, to file his federal habeas corpus petition.[9] <u>See</u> 28 U.S.C.

§ 2244(d)(1)(A); Fed. R. Civ. P. 6(a)(1)(c), (a)(6); <u>Catala</u>, 273 F. Supp. 2d at 471. Dixson signed

his Petition on August 28, 2018, and the Court received the submission on September 11, 2018.

<u>See</u> Pet. at 15. To address the timeliness of his filing, Dixson attached to his Petition a letter

dated August 30, 2018, explaining that the correspondence officer returned the Petition to

Dixson because he allegedly did not have enough funds to cover the costs of mailing. <u>Id.</u> at 19.

Relying on the date of the letter, August 30, 2018, as the date Dixson placed the Petition in the

prison's mail system, the Court finds that the Petition was timely filed.[10] In addition, the

Respondent does not challenge the timeliness of the Petition.

    **B.     Exhaustion**

      As previously noted, the exhaustion requirement compels a petitioner to "fairly present"

his or her claim to the highest state court in a manner that alerts the court to "the federal nature of

the claim." <u>Baldwin</u>, 541 U.S. at 29. Dixson's petition raises three claims: (1) his conviction was

against the weight of the evidence; (2) he was identified from an unduly suggestive photo array

---

[9] The last day for Dixson to file his petition for a writ of *certiorari* fell on Sunday, September 3, 2017, and the following day, Monday, September 4, 2017, was Labor Day, a federal holiday.

[10] Because Dixon is incarcerated, the petition is deemed filed when it is delivered to the prison mailbox for mailing. <u>See</u> <u>Houston v. Lack</u>, 487 U.S. 266, 270 (1988); <u>Walker v. Jastremski</u>, 430 F.3d 560, 562–64 (2nd Cir. 2005).

and corporal lineup; and (3) his sentence is excessive. Pet. at 16–18. Here, it is unclear which claims have been presented to the New York Court of Appeals, thereby permitting their review on the merits in this habeas proceeding.

Dixson's Petition notes that he sought leave to appeal to the Court of Appeals on the question of whether "existing law holding that the passage of time alone can dissipate the taint resulting from suggest[ive] identification procedure." Pet. at 3. The Supplement to Application for Leave to Appeal ("Supplemental Leave Application") clearly raises this claim, though the letter itself referred to "suggestive identification *procedures*." ECF No. 13, Ex. 12 (emphasis added). This is most easily construed as "ground two" of the Petition, asserting that Dixson was subjected to unduly suggestive identification procedures—the photo array and the lineup. Pet. at 17. Accordingly, because that question has been presented in federal terms to the Court of Appeals, the Court considers Petitioner's claim relating to the suggestive identification procedures as exhausted. See Baldwin, 541 U.S. at 29.

Whether Dixson's other claims are exhausted is more complicated. The Petition lists only the suggestive identification procedures claim as the ground for appeal to the Court of Appeals, Pet. at 3; reading the Petition to signify that Dixson raised *only* this claim would render his other claims unexhausted because they were never raised to the state's highest court. Baldwin, 541 U.S. at 29. That view is supported by Dixson's note in his Petition, which states that he "was told by appellate attorney that an article 440.10 would be the appropriate vehicle to raise said issue from supplemental appella[n]t[]'s brief." Pet. at 5. In addition, Dixson himself seemingly recognized that he had numerous unexhausted claims that he wished to go back and exhaust, including an ineffective assistance of counsel claim and other claims not previously raised. See ECF No. 11. Dixson did not indicate that the ineffective assistance of counsel claim he wanted to

exhaust was a *separate* ineffective assistance of counsel claim than the one he raised before the Appellate Division, so the Court assumes he referred to his prior ineffective assistance of counsel claim. See id.

Dixson's initial *pro se* letter seeking leave to appeal to the Court of Appeals is not in the record; however, the Supplemental Leave Application filed by the Office of the Appellate Defender on Dixson's behalf addresses only the suggestive identification procedures claim. See ECF No. 13, Ex. 12. The Bronx County District Attorney's Office's opposition to Dixson's application for leave to appeal, moreover, refers *only* to the suggestive identification procedures claim raised in the Supplemental Leave Application. Id. Thus, the apparent content of Dixson's letters before the Court of Appeals would also render the two other claims identified in his Petition as unexhausted.

The Supplemental Leave Application notes that "[c]opies of the briefs filed in the Appellate Division . . . were submitted with" Dixson's initial application for leave to appeal. Id. at 1. The Court of Appeals has:

> held that if a defendant, in an initial leave letter to the Chief Judge of the Court of Appeals, states that he "request[s] this court to consider and review all issues outlined in Defendant–Appellant's [Appellate Division] brief," such a request is "sufficiently specific" to present any federal constitutional claim set forth in the Appellate Division brief to the state Court of Appeals.

Davis v. Strack, 270 F.3d 111, 122 (2d Cir. 2001) (citing Morgan v. Bennett, 204 F.3d 360, 369–72 (2d Cir. 2000)) (alterations in original). Because the record before the Court does not include Dixson's initial letter seeking leave to appeal, the Court would have to liberally construe Dixson's *pro se* filings to consider him to have "requested" that the Court of Appeals review all the issues in this Appellate Division briefs. See Gomez, 655 F. Supp. 2d at 342. But such a reading is not in harmony with the fact that Dixson *stated* that he had not sought to appeal the

ineffective assistance of counsel claim, and that he later intended to exhaust that claim by filing a

§ 440.10 motion. <u>See</u> Pet. at 5; ECF No. 11.

      Accordingly, the Court determines that only Dixson's unduly suggestive identification

procedures claim has been raised to the state's highest court in federal terms and is thereby fully

exhausted. In so finding, the Court also determines that Dixson has brought a mixed petition. <u>See</u>

<u>Zarvela</u>, 254 F.3d at 380–82; ECF No. 14 at 4. Because AEDPA's one-year statute of limitations

has already expired, dismissal of the entire mixed petition would impair Dixson's ability to seek

habeas relief in federal court. "Whether this would *unreasonably* impair [Dixson's] right to

obtain federal relief is not entirely clear, given the number of second chances [he] has been

afforded over the life of this petition." <u>Reyes v. Phillips</u>, No. 02-cv-07319 (LBS), 2005 WL

2173812, at *1, *8 (S.D.N.Y. Sept. 6, 2005) (emphasis in original) (giving the petitioner the

option to delete his unexhausted claims after holding that the renewed petition still contained

unexhausted claims and that the petitioner was not entitled to a second stay). A court should

consider the fact that "a procedural dismissal 'of a first federal habeas petition is a particularly

serious matter.'" <u>Ross v. Artuz</u>, 150 F.3d 97, 100 (2d Cir. 1998) (quoting <u>Lonchar v. Thomas</u>,

517 U.S. 314, 324 (1996)). To avoid dismissing the petition in its entirety, "[t]he Court presumes

that [Dixson] would prefer his unexhausted claims deleted and other claims reviewed, and the

Court proceeds as such." <u>Johnson v. Kirkpatrick</u>, No. 11-cv-01089 (CM) (AJP), 2011 WL

3328643, at *14 (S.D.N.Y. Aug. 3, 2011), <u>report and recommendation adopted sub nom.</u>,

<u>Johnson v. New York</u>, 2012 WL 112249 (S.D.N.Y. Jan. 12, 2012).

### III.   Analysis of Petitioner's Claims

Dixson's suggestive identification procedures claim is the only fully exhausted claim that the Court can review on the merits. However, because some of Dixson's additional claims may be procedurally barred, and can be deemed exhausted, the Court examines each claim in turn.

### A. Dixson's Unduly Suggestive Identification Procedures Claim

Dixon asserts that he "was identified from an unduly suggestive photo array and corporal line-up." Pet. at 17. But the ambiguity in the Appellate Division's decision requires this Court to first determine whether or not Dixson's unduly suggestive identification procedures claim was adjudicated "on the merits" in order to determine the appropriate level of deference. See Norde, 294 F.3d at 409.

#### 1. Level of Deference

The Appellate Division's opinion clearly refers to Dixson's lineup claim, making it an "adjudication on the merits" and warranting AEDPA's deferential review. Dixson, 147 A.D.3d at 484; see Sellan, 261 F.3d at 31.

But the Appellate Division makes no mention of Dixson's photo array. Dixson clearly raised two components or "sub claims" in his (counseled) Appellate Division briefing, arguing that he was "identified from an unduly suggestive *array and lineup*," and proceeding to discuss *both* the photo array and lineup. ECF No. 13, Ex. 6 at 9. The standard is relatively low for when an issue can be considered to have been adjudicated "on the merits"—the standard is met even when a "state court does not specifically mention the claim but uses general language referable to the merits," for example. Norde, 294 F.3d at 410 (first citing Aparicio v. Artuz, 269 F.3d 98, 94 (2d Cir. 2001); and then citing Sellan, 261 F.3d at 312–14). Yet there is no indication that the

Appellate Division analyzed the photo array component of his claim; that court's one-paragraph

analysis as to Dixson's motion to suppress exclusively focuses on the lineup:

> The court properly denied defendant's motion to suppress the
> victim's identification of defendant in a six-person lineup. The taint
> of any prior unduly suggestive identification procedures, conducted
> more than two months earlier, was dissipated by the passage of time
> . . . . The lineup fillers did not differ so much from defendant's
> appearance or the victim's description of the perpetrator as to single
> out defendant unfairly . . . .

Dixson, 147 A.D.3d at 484.

Accordingly, the Court finds that "there is no showing that the Appellate Division

adjudicated this issue on its merits." Spears, 459 F.3d at 204. The court's determination that the

"taint of any prior unduly suggestive identification procedures . . . dissipated" does not give any

"indication that [the Appellate Division] had considered or disposed of" Dixson's photo array

argument on the merits. Id.; see Norde, 294 F.3d at 410 (finding that the Appellate Division "did

not mention" the petitioner's Sixth Amendment claims and contained no indication that those

claims "were considered and denied on the merits").

Thus, because the Appellate Division did not indicate that it considered Dixson's photo

array claim on the merits, AEDPA's deferential standard of review does not apply, and instead

the Court evaluates the photo array issue de novo. See Norde, 294 F.3d at 410–11.

### 2. Relevant Established Law

"[R]eliability is the linchpin in determining the admissibility of identification

testimony . . . ." Manson v. Brathwaite, 432 U.S. 98, 114 (1977). Because the Fourth

Amendment protects against unduly suggestive police identification procedures, a Wade hearing

is held in criminal prosecutions to determine if a witness's identification was tainted by unduly

suggestive identification procedures. See United States v. Crews, 445 U.S. 463, 472–73 (1980);

Young v. Conway, 698 F.3d 69, 77 (2d Cir. 2009); Rivera v. Collado, No. 19-cv-11403 (RWL), 2021 WL 603047, at *8 (S.D.N.Y. Feb. 16, 2021).

Certainly, "the degree of suggestion inherent in the manner in which the prosecution presents the suspect to a witness for pretrial identification" can contribute to mistaken identification. Wade, 388 U.S. at 228. A pretrial identification procedure is impermissibly suggestive if it raises "a very substantial likelihood of irreparable misidentification." Neil v. Biggers, 409 U.S. 188, 197 (1972) (citing Simmons v. United States, 390 U.S. 377, 384 (1968)); accord Jarrett v. Headley, 802 F.2d 34, 40–41 (2d Cir. 1986).

The Court of Appeals for the Second Circuit has identified a two-step process to determine if a prior identification violates due process. Raheem v. Kelly, 257 F.3d 122, 133 (2d Cir. 2001). First, a court must "determine whether the pretrial procedures unduly and unnecessarily suggested that the defendant was the perpetrator." Id. "If the procedures were not suggestive, the identification evidence presents no due process obstacle to admissibility [and] no further inquiry by the court is required." Id. (internal citations omitted); see Perry v. New Hampshire, 565 U.S. 228, 232 (2012) ("[I]f the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth."). But if the court finds that the procedures were suggestive, "it must then determine whether the identification was nonetheless independently reliable." Raheem, 257 F.3d at 133; see also Manson, 432 U.S. at 114; Neil, 409 U.S. at 199.

The Supreme Court has also clarified that the due process considerations given to identification procedures do not extend "to cases in which the suggestive circumstances were not arranged by law enforcement officers." Perry, 565 U.S. at 232–33 (clarifying that its "decisions

. . . turn on the presence of state action and aim to deter police from rigging identification procedures, for example, at a lineup, showup, or photograph array").

### 3.  The Lineup

Dixson argues that the lineup was unduly suggestive because (1) it was "tainted by the suggestive photo array," (2) "the fillers did not resemble [him] or Chavez's description," and (3) "prior to the lineup, officers told Chavez that . . . they had 'caught' the guy." Pet. at 17. Applying AEDPA's deferential standard of review, the Court concludes that the state court's determination on Dixson's lineup claim was not an unreasonable application of established Supreme Court precedent and was "fairly supported by the record." See 28 U.S.C. § 2254(d) (1994); Concepcion v. Martuscello, No. 16-cv-05918 (LAP) (GWG), 2017 WL 4536087, at *7 (S.D.N.Y. Oct. 11, 2017) ("In the context of a petition for a writ of habeas corpus, . . . the rule set forth in Simmons is stated broadly and thus a state court's determination of suggestiveness is entitled to 'substantial deference.'" (citing Dunlap v. Burge, 583 F.3d 160, 166 (2d Cir. 2009))), report and recommendation adopted, 2018 WL 4283736 (S.D.N.Y. Sept. 7, 2018).

After the pre-trial Wade hearing, the trial court concluded that the lineup was not unduly suggestive. ECF No. 13, Ex. 3 at 7. The Appellate Division itself concluded that the trial court had "properly denied [Dixson]'s motion to suppress the victim's identification of [Dixson] in a six-person lineup" because "[t]he taint of any prior unduly suggestive identification procedures, conducted more than two months" before the lineup "was dissipated by the passage of time." Dixson, 147 A.D.3d at 484. The Appellate Division also determined that the "lineup fillers did not differ so much from defendant's appearance or the victim's description of the perpetrator as to single out defendant unfairly." Id.

The Appellate Division's determination that any taint from prior identification procedures had attenuated by the time Dixon was identified at the lineup is a reasonable application of federal law. See Simmonds v. Kuhlman, No. 97-cv-07539 (EHN), 2000 WL 1833722, at *5 (E.D.N.Y. Dec. 7, 2000) ("In any event, a twenty month interval passed between the photographic procedure and the lineup identification procedure so that any possible taint would likely have been attenuated to such a degree as not to have affected the admissibility of the lineup identification."); Williams v. Senkowski, No. 03-cv-03123 (DRH), 2016 WL 8711377, at *18 (E.D.N.Y. Jan. 22, 2016) (concluding that there was no due process violation in the trial court's refusal to suppress a lineup when the witness had previously seen photos in the newspaper of the defendant).

Dixson has argued that at the time of the lineup, as a "5'10," 220 pound, 35-year-old light-skinned Black man—[he wa]s the only individual pictured with features that c[a]me close to matching the complainant's description" in the array, and "the five selected fillers in the lineup had features that lay in 'stark contrast'" to him, due to differences in weight, height, age, and skin color. ECF No. 13, Ex. 6 at 12, 18. The Appellate Division's determination that the appearance of the lineup fillers did not single out Dixson unfairly is consistent with federal law. If a defendant "meets the description of the perpetrator previously given by the witness and the other lineup participants obviously do not," then the lineup is unduly suggestive. Douglas v. Portuondo, 232 F. Supp. 2d 106, 112 (S.D.N.Y. 2002) (quoting Raheem, 257 F.3d at 134). But "[t]here is no requirement that a suspect in a lineup be surrounded by people identical in appearance." Tavarez v. LeFevre, 649 F. Supp. 526, 530 (S.D.N.Y. 1986). "Even if there are some physical differences, a photo-array or line-up will not be suggestive so long as the other pictures or stand-ins sufficiently resembled the defendant 'to allay any concern that the witness

might have been unfairly influenced in their selection of him by any of the noted physical differences between him and the others.'" United States v. Padilla, No. 94-cr-00313, 1994 WL 681812, at *6 (S.D.N.Y. Dec. 5, 1994); see also Roldan v. Artuz, 78 F. Supp. 2d 260, 274 (S.D.N.Y. 2000) ("Even if all of the lineup fillers were older, however, this is not enough to constitute an unduly suggestive lineup."); Keita v. Fields, No. 20-cv-06154 (JMF), 2020 WL 6647288, at *2 (S.D.N.Y. Nov. 12, 2020) (denying on the merits the petitioner's claim that age differences between him and the fillers resulted in a unduly suggestive lineup).

Finally, Dixson's contention that the state court erred in denying his motion to suppress because the statements made to Chavez before the lineup rendered the lineup unduly suggestive also has no merit. The trial court determined that the police informing Chavez that they had "caught the guy" did not taint the lineup. Dixson, 147 A.D.3d at 484. Although the Court of Appeals has "expressed disapproval" of such statements, it has concluded that any suggestiveness stemming from such a statement is "minimal" when the "statement preceded an otherwise acceptable lineup." Sales v. Harris, 675 F.2d 532, 538 (2d Cir. 1982); United States v. Gambrill, 449 F.2d 1148, 1151 n.3 (D.C. Cir. 1971) ("It must be recognized . . . that any witness to a crime who is called upon to view a police lineup must realize that he would not be asked to view the lineup if there were not some person there whom the authorities suspected."). Accordingly, the trial court's determination that "nothing said to Chavez rendered the lineup unduly suggestive" was neither "contrary to" nor an "unreasonable application" of federal law, under which Dixson would have to show that there was a "very substantial likelihood of irreparable misidentification." Simmons, 390 U.S. at 384; see also Thomas v. Griffin, No. 14-cv-03559 (KMK) (PED), 2019 WL 7756150, at *8 (S.D.N.Y. Dec. 30, 2019), report and recommendation adopted, 2020 WL 418546 (S.D.N.Y. Jan. 27, 2020) (concluding that a

detective's statement to an eyewitness "('I told him that we have received information identifying a suspect with a street name and that I was going to show him six photos and I asked him if he could identify anybody') was neutral and did not improperly induce the witness to misidentify" the petitioner). The Court therefore concludes that Dixson's lineup claim has no merit.

### 4. The Photo Array

Dixson has alleged that the photo array shown to Chavez was unduly suggestive because (1) his "photograph was more closely cropped and of lower resolution than the photographs of the five other fillers," (2) he was "the only participant who resembled Chavez's description," and (3) it was "tainted by Victor Seguinot's single photo show up." Pet. at 17. The Court reviews this claim de novo. See supra Section III.A.1.

Upon reviewing the photo array, the Court concludes that the difference in the cut and resolution of Dixson's photo did not create a "very substantial likelihood of irreparable misidentification." Simmons, 390 U.S. at 384. There is no significant difference in the resolution of Dixson's photo as compared to the other five photos to render the photo array unduly suggestive. See Davidson v. Capra, No. 15-cv-09840 (LGS) (JLC), 2018 WL 1637967, at *17 (S.D.N.Y. Apr. 4, 2018) (finding differences in background and clarity in the photo array were not suggestive), report and recommendation adopted, 2019 WL 2342980 (S.D.N.Y. May 31, 2019). And although the "cut" of Dixson's photo is such that his image appears to be slightly more "zoomed in" than some of the other photographs, that does not render the array unduly suggestive. Id.

Nor is the Court convinced that the array is unduly suggestive because, as Dixson contends, he "was the only participant who resembled Mr. Chavez's description." See Pet at 17.

33

Chavez had described his robber as 30 years old, 5' 10", and "Puerto Rican," "Hispanic" or "Black Hispanic." Hearing Tr. at 61, 70–71. The photo array used is not "so limited that the defendant is the only one to match the witness's description of the perpetrator." United States v. Maldonado-Rivera, 922 F. 2d 934, 974 (2d Cir. 1990). The Court's review of the photo array reveals men of roughly the same age and of varied skin color. See ECF No. 13, Ex. 1. And because of the close cropping of the images, the Court cannot tell any significant differences in weight or height among the men pictured, and the differences that are visible "would hardly suggest to an identifying witness that [Petitioner] was more likely to be the culprit." United States v. Bautista, 23 F.3d 726, 731 (2d Cir. 1994) (quoting United States v. Archibald, 734 F.2d 938, 940 (2d Cir. 1984)); see also Hornedo v. Artus, No. 04-cv-03201 (NGG) (RLM), 2008 WL 346360, at *13 (E.D.N.Y. Feb. 6, 2008) (photo array was not unduly suggestive where individuals shown were of similar age, shared similarly facial features, closely cropped dark hair, and facial hair that minimized differences in skin tone); United States v. Levy, No. 04-cr-00559 (NGG), 2005 WL 2179650, at *2 (E.D.N.Y. Sept. 9, 2005) (six-photo array of men of "approximately the same age, roughly similar complexion . . . and roughly similar hairstyles" was not unfairly suggestive). "It is not required . . . that all of the photographs in the array be uniform with respect to a given characteristic." Jarrett, 802 F.2d at 41 (2d Cir. 1986); accord United States v. Thai, 29 F.3d 785, 808–09 (2d Cir. 1994). Accordingly, the Court finds no merit in Dixson's photo array claim.[11]

    Dixson also alleges that Seguinot's single photo show up of two photos of Dixson tainted the photo array, which were conducted a mere six days apart. See Hearing Tr. at 16, 47. Seguinot had shown Chavez two photos of Dixson—his driver's license and an employee I.D.—on August

---

[11] Because Court concludes that the photo array is not unduly suggestive, it need not determine whether the identification was independently reliable. See Concepcion, 2017 WL 4536087, at *8 n.6.

4, 2011; Chavez participated in an NYPD-arranged photo array which used the driver's license photo on August 11, 2011. See id. at 12–13; ECF No. 13, Ex. 1.

It is true, as courts in this Circuit have recognized, that "[a] growing body of scientific research" has shown that certain factors, such as "the witness's exposure to [the] defendant through *multiple identification procedures* [ ] may impair the ability of a witness . . . to accurately process what she observed." United States v. Nolan, 956 F.3d 71, 80 (2d Cir. 2020) (quoting Young, 698 F.3d at 78–79; citing National Research Council, Identifying the Culprit: Assessing Eyewitness Identification (2014)) (emphasis added) (second alteration in original). By the time Chavez participated in the NYPD's photo array on August 11, 2011, he had already been shown two photos of Dixson, and one of the photos used at the photo array was the same driver's license photo that Seguinot had shown Chavez six days before.

But the crux of the problem for Dixson is that the photo array may have been unduly suggestive *not* because of any intentional conduct by the state, but rather by a private actor— Seguinot. The Court agrees with the trial court's determination that Seguinot was a private citizen who acted on his own accord when he showed Chavez photographs of Dixson. ECF No. 13, Ex. 3 at 5, n.2. As the Supreme Court discussed in Perry, the due process concerns with suggestive identification procedures are "linked . . . only to *improper police arrangement* of the circumstances surrounding an identification." Perry, 565 U.S. at 242 (emphasis added). Therefore, regardless of the possible suggestiveness of the photo array so closely after Seguinot's single photo show up, the constitutional protections against suggestive identification procedures do not, at least in this context, apply when the taint stems from the actions of a private individual. See id. at 232 ("An identification infected by improper police influence . . . is not automatically excluded."). "When an identification results from circumstances that are not

35

police-arranged, the defendant . . . is limited to the constitutional safeguards available at all trials—compulsory process and cross-examination—in challenging the reliability of the identification testimony." Mehler, Gleeson, & James, Federal Criminal Practice: A Second Circuit Handbook § 23-4 (15th rev. ed. 2015).

Accordingly, Dixson's claim that the photo array and lineup were unduly suggestive is without merit.[12]

### B.  Dixson's Weight of the Evidence Claim

In his first-listed claim, Dixson argues that his conviction was against the weight of the evidence because "the sole eyewitness failed to identify Mr. Dixson in court, gave contradictory testimony regarding the physical characteristics of his assailant, and provided inconclusive testimony regarding the use of a dangerous instrument." Pet. at 16. Because that claim was not raised to the Court of Appeals, the claim is unexhausted.

### 1.  Dixson's Unexhausted Weight of the Evidence Claim is Deemed Exhausted and Procedurally Barred.

A district court need not require that a petitioner present his federal claim to a state court to satisfy the exhaustion requirement, however, "if it is clear that the state court would find the claim procedurally barred." Reyes v. Keane, 118 F.3d 136, 139 (2d Cir. 1997) (quoting Grey v. Hoke, 933 F.2d 117, 120 (2d Cir. 1991)). Because Dixson already pursued his one appeal to the Appellate Division and one request for leave to appeal to the Court of Appeals, he would not be able to return to state court to raise his weight of the evidence claim. See Aparicio, 269 F.3d at 91. Although Dixson may seek collateral review of his conviction under CPL § 440.10, "such

---

[12] Had the Court determined that the Appellate Division's decision *did* address the photo array issue on the merits, the Court would have arrived at the same conclusion on this issue by applying AEDPA-level deference.

review is not available if the claim could have been raised (or was actually decided) on direct review." Priester v. Senkowski, No. 01-cv-03441 (LMM) (GWG), 2002 WL 1448303, at *4 (S.D.N.Y. July 3, 2002) (citing CPL § 440.10(2)(a), (c)). New York state courts "'must deny a motion to vacate' a conviction on a particular issue when 'sufficient facts appear on the record of the proceedings underlying the judgment' to have permitted review of the issue on appeal and there was an 'unjustifiable failure' to raise the ground on appeal." Id.; see Grey, 933 F.2d at 120 ("Collateral review of th[is] claim[] is also barred because the issue[] w[as] previously determined on the merits on direct appeal." (citations omitted)). Therefore, Dixson "no longer has remedies available in the New York state courts under 28 U.S.C. § 2254(b). Grey, 933 F.2d at 121 (internal quotation marks omitted).

Having "not been presented to the highest state court," Dixson's weight of the evidence claim "will be deemed exhausted if it has become procedurally barred under state law." See St. Helen v. Senkowski, 374 F.3d 181, 183 (2d Cir. 2004) (citing Grey, 933 F.2d at 120). Such a procedural default will bar federal habeas review of a federal claim "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[] will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991). Absent a demonstration of cause, the Court need not evaluate the prejudice element. See Stepney v. Lopes, 760 F.2d 40, 45 (2d Cir. 1985) ("Since a petitioner who has procedurally defaulted in state court must show both cause and prejudice in order to obtain federal habeas review, we need not, in light of our conclusion that there was no showing of cause, reach the question of whether or not [the petitioner] showed prejudice."). And the fundamental miscarriage of justice exception is

"explicitly" tied to a petitioner's actual innocence and is therefore a rare exception applied in

"extraordinary case[s]." Schlup v. Delo, 513 U.S. 298, 321 (1995).

      Dixson has not established that either exception applies. Dixson has not explained why he

did not present his weight of the evidence claim before the Court of Appeals, as compared to his

explanation for why he did not raise his ineffective assistance of counsel claims. See ECF Nos.

16, 22. Liberally construed, Dixson's arguments regarding the weight of the evidence and the

inconclusive testimony could be read as arguments for his actual innocence. See Johnson, 2011

WL 3328643, at *17 (construing the petitioner's arguments as to DNA evidence as an argument

for his actual innocence). However, Dixson does not meet the heavy burden required to succeed

on the fundamental miscarriage of justice exception. "'[A]ctual innocence' means factual

innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623–24 (1998)

(citing Sawyer v. Whitley, 505 U.S. 333, 339 (1992)). Accordingly, a fundamental miscarriage

of justice claim "requires [a] petitioner to support his allegations of constitutional error with new

reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness

accounts, or critical physical evidence—that was not presented at trial." Schlup, 513 U.S. at 324.

      Dixson has not presented any new evidence—either in his Appellant Brief or in his

Petition—to support his actual innocence. See Dunham v. Travis, 313 F.3d 724, 730 (2d Cir.

2002) ("To demonstrate actual innocence a habeas petitioner must show that it is more likely

than not that no reasonable juror would have convicted him in light of the new evidence."

(quoting Schlup, 513 U.S. at 327) (cleaned up)). Therefore, Dixson's weight of the evidence

claim should be denied as it is procedurally barred from federal habeas review.

**2.   In the Alternative, Dixson's Claim is Exhausted, But Not Cognizable on Habeas Review.**

As previously noted, an alternative reading of Dixson's appeal to the Court of Appeals would construe his weight of the evidence claim to have been properly exhausted by function of its inclusion in his counseled Appellate Division briefs and those briefs being submitted to the Court of Appeals. But even with this alternative analysis, relief would still not lie. A petitioner's claim that his conviction was against the weight of the evidence is not a basis for federal habeas relief because it is based upon "an error of state law, for which habeas review is not available." Garrett v. Perlman, 438 F. Supp. 2d 467, 470 (S.D.N.Y. 2006) (quoting Douglas, 232 F. Supp. 3d at 116). Unlike a legal sufficiency claim, which "is based on federal due process principles," "a weight of the evidence argument is a pure state law claim grounded in" CPL § 470.15(5). Correa v. Duncan, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001) (internal quotation marks omitted). Moreover, "assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on [habeas] appeal." Garrett, 438 F. Supp. 2d at 470 (quoting Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996)) (second alteration in original); see also Douglas, 232 F. Supp. 2d at 115–16 ("[t]he determination of how much weight to accord eyewitness testimony . . . is a matter of credibility," which is determined by a jury). Therefore, Dixson's "weight of the evidence" claim, even if exhausted, does not present this Court with a federal claim as required by 28 U.S.C. § 2254(a).

**3.   If Construed as a Legal Sufficiency Claim, the Claim should be Denied on the Merits.**

Nevertheless, because Dixson is proceeding *pro se*, "the Court will interpret his petition liberally. . . . [and] will construe his weight of the evidence claim as a claim that his conviction was based on legally insufficient evidence," "which is based upon federal due process principles." Smith v. Lee, No. 10-cv-06941 (JGK), 2012 WL 5288742, at *3 (S.D.N.Y. Oct. 26,

39

2012) (internal quotation marks omitted); <u>Garrett</u>, 438 F. Supp. 2d at 470–71. A federal court considering a sufficiency of the evidence claim must view "the evidence in the light most favorable to the prosecution" and must "defer to the trial court in making 'assessments of the weight of the evidence or the credibility of witnesses.'" <u>Smith</u>, 2012 WL 5288742, at *3 (first quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979), and then quoting <u>Maldonado</u>, 86 F.3d at 35). The petition may be granted only "if the petitioner has shown that 'upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.'" <u>Id.</u> (quoting <u>Jackson</u>, 443 U.S. at 324). The court must "look to state law to determine the elements of the crime" of which the petitioner was convicted. <u>Quartararo v. Hanslmaier</u>, 186 F.3d 91, 97 (2d Cir. 1999) (citing <u>Green v. Abrams</u>, 984 F.2d 41, 44–45 (2d Cir. 1993)).

Under New York law,

> A person is guilty of robbery in the first degree when he forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime:
>
> 1. Causes serious physical injury to any person who is not a participant in the crime; or
> 2. Is armed with a deadly weapon; or
> 3. Uses or threatens the immediate use of a dangerous instrument; or
> 4. Displays what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm; except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a loaded weapon from which a shot, readily capable of producing death or other serious physical injury, could be discharged. Nothing contained in this subdivision shall constitute a defense to a prosecution for, or preclude a conviction of, robbery in the second degree, robbery in the third degree or any other crime.

N.Y. Penal L. § 160.15(3).

Dixson contends that the testimony of Chavez, as the sole eyewitness to the incident, was unreliable, doubtful, contradictory, and inconclusive, particularly regarding Chavez's failure to identify Dixson in court and his testimony about the fishhook. See ECF No. 13, Ex. 5 at 29; id., Ex. 6 at 1–8. This claim, to the extent it is construed as a sufficiency of the evidence claim, fails. Dixson's assertion that Chavez's testimony was not credible, "even construed liberally, cannot support a conclusion that the Appellate Division's affirmance was contrary to or an unreasonable application of federal law." Garrett, 438 F. Supp. 2d at 471; see Dixson, 147 A.D.3d at 484 ("There is no basis for disturbing the jury's credibility determinations, including its evaluations of the victim's testimony that he was certain of the accuracy of his identification of defendant in the lineup . . . . [and] that defendant placed a large commercial fishhook to his abdomen and threatened to kill him," thereby establishing the dangerous instrument element).

Viewed in the light most favorable to the prosecution, the evidence adduced at trial was sufficient for a rational trier of fact to find beyond a reasonable doubt that Dixson forcibly stole $2,000 from Chavez by threatening the immediate use of a dangerous instrument, namely, a fishhook. Chavez testified that he saw his perpetrator's face. Trial Tr. at 11, 13. He further testified that the perpetrator used a fishhook that left a mark on Chavez's stomach. Id. at 10, 32, 39. Although he did not recognize Dixson in court after nearly two years had passed, Chavez recognized himself and the perpetrator on the video surveillance footage. Id. at 16–17, 25–26. Chavez also recognized Dixon in the lineup as the person who robbed him. Id. at 34, 59; Hearing Tr. at 23. Boodhoo recognized Dixson in court and noted that he frequently saw Dixson drive an old white Chevy Tahoe with a Delaware license plate. Trial Tr. at 115–17. Seguinot viewed video surveillance of the perpetrator on a forklift, followed by his departure in a white Chevy suburban vehicle with a Delaware license plate a minute later. Id. at 132, 143, 145–46, 152–55.

Both Seguinot and Chavez identified Dixson as a fish market employee because of his attire. Id. 12, 44, 135–37. Guzman also recognized Dixson in court and added that Dixson had asked him for a ride on Guzman's forklift the night of the robbery. Id. at 215–16, 218. Lastly, at the grand jury, Dixson testified that he went into the fish market's bathroom around 1:30 a.m. on August 1, 2011, and saw someone talking to himself; that he was wearing the fish market's salesman's attire, including a fishhook; that he drove a 1995 Chevy Tahoe and never returned to work after August 1, 2011. Id. at 187, 189, 191–93, 195, 197. Thus, even if Dixson's claim is cognizable for federal habeas review, the Court cannot conclude that "the Appellate Division's affirmance was contrary to or an unreasonable application of federal law." Garrett, 438 F. Supp. 2d at 471; see Edwards v. Jones, 720 F.2d 751, 755 (2d Cir. 1983) ("[T]he testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction.").

Therefore, the Court concludes that Dixson's weight of the evidence claim is unexhausted, but deemed exhausted and procedurally barred, and therefore recommends dismissing the weight of the evidence claim without reaching the merits. But in the alternative, the Court concludes that this claim be (a) dismissed for failing to raise a cognizable claim; or (b) denied for failing to establish a meritorious claim.

### C.  Dixson's Sentencing Claim

Dixson's third claim in his petition asserts that his "sentence of 15 years is excessive where it is disproportionate to the crime committed and unjustified by his previous criminal history." Pet. at 18. At the Appellate Division, Dixson argued that his sentence is "plainly excessive" because it is "nearly twice the statutory minimum of eight years." ECF No. 13, Ex. 7 at 1–3. The Appellate Division "perceive[d] no basis for reducing the sentence." Dixson, 147 A.D.3d at 484.

This claim is unexhausted. The Court has already concluded that Dixson's sentencing claim was never raised to the Court of Appeals on direct appeal. But even if it had been, Dixson's brief to the Appellate Division did not "cit[e] any federal case law and ma[de] no mention of any constitutional rights." Johnson, 2011 WL 3328643, at *15; see ECF No. 13, Ex. 7 at 1–3. By failing to make any reference to any sentencing-related constitutional arguments, Dixson would not have given the state court an opportunity to evaluate this claim under federal law. See Bell v. Ercole, 631 F. Supp. 2d 406, 418 (S.D.N.Y. 2009) ("To the extent that [the petitioner] also present[ed] a federal claim under the Eighth Amendment, the Court finds this claim unexhausted because the constitutional dimension of the excessive-sentence claim was not 'fairly presented' to the state courts on direct appeal." (citation omitted)). For the same reasons articulated for the weight of the evidence claim above, the Court also finds that Dixson has not shown cause for the default or prejudice, which would allow the Court to address the merits of his unexhausted and procedurally barred claim. See Bossett v. Walker, 41 F.3d 825, 829 (2d Cir. 1994).

Moreover, even had this claim been exhausted, it would not be cognizable on habeas review. See ECF No. 14 at 17–18. When the imposed sentence is within the range prescribed by state law, no federal constitutional issue is presented, and therefore, no ground for habeas relief is available. White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992) (per curiam). Because the decision of a sentencing court is entitled to substantial deference, "a reviewing court rarely will be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate." Edwards v. Marshall, 589 F. Supp. 2d 276, 290 (S.D.N.Y. 2008) (quoting United States v. Persico, 853 F.2d 134, 138 (2d Cir. 1988)) (internal quotation marks omitted). Dixson was convicted of first-degree robbery, a class B felony. N.Y. Penal L. § 160.15(3). As a

second felony offender, Dixson faced 8 to 25 years in state prison. N.Y. Penal L. § 70.06(6)(a).

Thus, his 15-year sentence falls within the statutory range and would not be cognizable for

review. See Bell, 631 F. Supp. 2d at 418–19.

      For these reasons, the Court recommends denying Dixson's sentencing claim.

### D.  Dixson's Independent Source Claim

      Dixson's argument that the trial court erred by failing to establish an independent source

basis for identification, as elaborated in his *pro se* Appellate Division brief, is also unexhausted.

      While the Appellate Division had an opportunity to review and consider this claim—

finding it "unavailing," Dixson, 147 A.D.3d at 484—the Court of Appeals has not. It is therefore

unexhausted. In addition, this claim is procedurally barred and unavailable for this Court's

review because Dixson has not elaborated the "cause for the default" or the prejudice or

fundamental miscarriage of justice that should occur if the Court did not consider this claim.

Coleman, 501 U.S. at 751; Grey, 933 F.2d at 120–21.

      Still, the Court considers the alternative—if the claim was deemed exhausted by virtue of

Petitioner including his Appellate Division briefs with his application for leave to appeal to the

Court of Appeals. Even then, the claim must be dismissed.

      "An independent source is required only when a lineup is unduly suggestive . . . ." Mathis

v. Marshall, No. 08-cv-03991 (LTS) (FM), 2012 WL 388539, at *22 n.12 (S.D.N.Y. Jan. 30,

2012) (citing People v. Chipp, 75 N.Y.2d 327, 335 (1990)), report and recommendation adopted,

2012 WL 2739873 (S.D.N.Y. July 9, 2012). Because it did not find the lineup (or the photo

array) unduly suggestive, the trial court's decision not to examine an independent source is not

an unreasonable application of federal law. See ECF No. 13, Ex. 3 at 5–6; see Raheem, 257 F.3d

at 135. The trial court properly ended the inquiry upon concluding that the pretrial identification

procedures were not suggestive. <u>Raheem</u>, 257 F. 3d at 133. Therefore, even when the substance of the claim is considered, it is without merit.

Accordingly, the Court recommends that Dixson's independent source claim be dismissed.

### E.  Dixson's Ineffective Assistance of Counsel Claim

In in his *pro se* supplemental brief before the Appellate Division, Dixson asserted that his trial counsel was ineffective for failing to seek to reopen the <u>Wade</u> hearing at trial pursuant to CPL § 710.40(4). ECF No. 13, Ex. 10.

As previously noted, Dixson asserted that he did not appeal the Appellate Division's decision on his ineffective assistance of counsel claim because his appellate attorney informed him that "an article 440.10 would be the appropriate vehicle to raise" the claim. <u>See</u> Pet. at 3, 5. On January 2, 2019, Dixson requested that the Court stay and hold in abeyance the Petition so that he could raise an "ineffectiveness of counsel" claim in state court, which he asserted was previously unexhausted. ECF No. 11. The Court granted Petitioner a stay of the petition so he could exhaust his unexhausted claims. <u>See</u> ECF No. 15. However, because Petitioner did not file a CPL § 440.10 motion after a year passed, the Court lifted the stay and deemed the petition fully submitted. <u>See</u> ECF No. 24.

Because Dixson never filed a CPL § 440 motion alleging ineffective assistance of trial counsel, and because "there is no time limit for filing such a motion, that remedy was still available to [Dixson] in state court when he filed his federal habeas petition." <u>Johnson</u>, 2011 WL 3328643, at *12.[13] Accordingly, his ineffective assistance of counsel claim is unexhausted and is

---

[13] CPL § 440.10(1) provides: "*At any time after the entry of a judgment*, the court in which it was entered may, upon motion of the defendant, vacate such judgment . . . ." (emphasis added).

45

not procedurally barred, and the Court finds deleting the ineffective assistance of trial counsel claim from the Petition to be the proper course.

## CONCLUSION

I recommend denying Dixson's petition as to the unduly suggestive identification procedures claim on the merits. I further conclude that Petitioner's weight of the evidence, excessive sentencing, and independent source claims are unexhausted, but may be deemed exhausted and procedurally barred from habeas review, and accordingly recommend that they be dismissed. Finally, I conclude that Dixson's ineffective assistance of counsel claim is unexhausted and should therefore be deleted from his Petition. Accordingly, I recommend that the Petition be DENIED.

The Clerk of Court is directed to mail a copy of this Report to the Petitioner.

DATED:     August 31, 2021
           New York, New York

SARAH NETBURN
United States Magistrate Judge

\*                    \*                    \*

### NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Katherine Polk Failla at the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York 10007, and to any opposing parties. See 28

U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Failla. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

47